USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 27, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------:

UNITED STATES OF AMERICA

                  v.

TREVOR COLE and
DOMINIQUE JEAN PHILIPPE,

                  Defendants.

-----------------------------------------------------------------------:

12 Cr. 802 (KBF)

MEMORANDUM
DECISION & ORDER

KATHERINE B. FORREST, District Judge:

On October 23, 2012, a five-count Indictment was returned against defendants Trevor Cole and Dominique Jean Philippe, charging conspiracies to commit both Hobbes Act robbery and kidnapping, the commission of such robbery and kidnapping, and the brandishing of firearms in connection therewith.[1]  The Government provided Cole with a Pimentel letter[2] on September 8, 2013, and, on September 9, 2013, Cole pled guilty to all five counts in the Indictment.  On September 8, 2013, Jean Philippe was also provided with a Pimentel letter and, on September 9, 2013, also pled guilty to all five counts.

---

[1] Defendant Jeremy Acevedo was also charged in the Indictment, but the Government entered into a nolle prosequi with him on May 2, 2013.  (ECF No. 30.)

[2] A "Pimentel letter" refers to a letter provided by the Government to a defendant, containing the Government's calculation of that defendant's offense level, criminal history category, and corresponding guidelines range as indicated in the U.S. Sentencing Commission's Sentencing Guidelines in effect at that time.  United States v. Pimentel, 932 F.2d 1029, 1034 (2d Cir. 1991).  A Pimentel letter does not constitute an agreement between the Government and a defendant; and in connection with his sentencing, a defendant is free to argue a different calculation is applicable.  A court must separately calculate the appropriate offense level and criminal history category; a court's calculation may be the same as or different from that of either the Government of a defendant.

In connection with the defendants' scheduled sentencing, the Government requested a <u>Fatico</u> hearing on two issues relevant to the calculation of the defendants' appropriate offense level under the United States Sentencing Guidelines: (1) whether the kidnapping involved a sexual assault (or, as described in connection with this crime in the Guidelines, "sexual exploitation"); and (2) whether the kidnapping included a ransom demand, as the Government contends it did. Each of these factual assertions—if found—result in a significant increase in the applicable Guidelines calculation, as they are associated with enhancements to a defendant's offense level.[3]

This Court held a <u>Fatico</u> hearing on January 15, 2014. At that hearing, the Government called both victims of the kidnapping (the female victim is referred to herein as "Victim 1", the male victim is referred to herein as "Victim 2"). Defendants cross-examined both victims but did not call any additional witnesses.

For the reasons set forth below, and as set forth in the Court's Order dated January 21, 2014 (ECF No. 86), the Court finds by a preponderance of the evidence that Victim 1 was sexually assaulted during the kidnapping and Victim 2 was subject to a ransom demand.

I.   FACTS

The determination of the disputed factual issues is critically dependent on the credibility of Victims 1 and 2. At the hearing, both were cross-examined; Victim 1 was cross-examined for a lengthy period of time. Throughout, both were clear and

---

[3] Six levels are added to an offense level calculation when a kidnapping included sexual exploitation. U.S.S.G. § 2A4.1(b)(5). Separately, six levels are added if a kidnapping involved a ransom demand. <u>Id.</u> § 2A4.1(b)(1).

consistent on all material facts. Having witnessed their demeanor and listened closely to their answers to numerous questions, the Court finds them credible and credits their version of the events at issue.

Defendants have pled guilty to conspiracies to commit armed robbery and kidnapping, and the armed robbery and kidnapping in which a firearm was brandished and serious bodily injury occurred. They are not contesting their participation in this high level outline of events.

In September 2012, Victim 2 was a marijuana dealer; Victim 1 had been his girlfriend for over four years. On Sunday, September 2, 2012, at approximately 10:00 p.m., Victim 1 was returning home to her apartment on Magenta Avenue in the Bronx after an evening of playing bingo, which she did regularly on Sunday evenings. Her boyfriend was out of town, attending a football game with his son.[4] The couple had previously lived at another apartment on Neill Avenue, also in the Bronx. They had been robbed at that apartment and subsequently moved to Magenta Avenue. Victim 2 continued to maintain the Neill Avenue apartment, and used it to store drugs and cash.

As she entered the floor of the building on which her one-bedroom apartment was located, Victim 1 was approached by two men carrying guns who demanded the keys to her apartment. Victim 1 identified defendant Cole as one of the two men, and there is no dispute that defendant Jean Philippe was the other. As the two men opened her apartment door, an internal alarm was triggered which Victim 1 then turned off. The men told her that they had come to take money and drugs; she

_____

[4] Victims 1 and 2 had argued prior to Victim 2 traveling out of town.

told them that those things were not kept in the apartment. The two men then ransacked the apartment, in what appeared to be an effort to locate the money and drugs. Victim 1 was in the bedroom while this was occurring and tried to block the door to prevent the men from entering. She was unsuccessful and the men then bound her eyes, wrists, and ankles with duct tape. At one point they put a sock in her mouth and also taped it shut; Victim 1 indicated she could not breathe and that she would not do anything and would try to cooperate if they removed it. They removed the tape on her mouth but left her otherwise bound. She remained bound for the duration of the kidnapping, which continued until Tuesday, September 4.

After initially binding Victim 1, the men placed her on the bedroom floor. The men then tried to force Victim 1 to call her boyfriend; she initially refused, but then she called a number she knew was no longer in service. After approximately one full day, Victim 1 agreed to call the correct number. While one of the men held her cell phone to her ear, she called her boyfriend and requested that he come to the Magenta Avenue apartment because she needed money for some medication. Victim 2 subsequently left the money tucked into the side-mirror on her car, which was parked on the street, but did not come upstairs to the apartment. Victim 1 called again and again requested that her boyfriend come up to the apartment, this time on the pretext that she wanted to discuss with him issues that had been the topic of a disagreement between them a few days prior. Victim 2 stated that he would come over the following day, Tuesday.

4

Throughout this time, Victim 1 remained bound and was not able to use the bathroom. She soiled herself and remained in that condition on the floor of the bedroom. Additional people came into the apartment at various points. Victim 1 could hear different male voices.

On Monday evening, Victim 1 was raped by "about three" men. During the rape, she remained bound and on the bedroom floor.[5] Following the rape, one of the men urinated on her and Victim 1 was placed in the tub in the bathroom adjacent to the bedroom. That same night, Victim 1 could hear a female voice.

On Tuesday, while Victim 1 was in the bathtub, the robbers forced her to call Victim 2 again; this time she asked that he bring food. She requested a type of food that she hoped he would understand she would never want, thereby triggering an awareness that something was wrong. Victim 2 did not catch on, and subsequently brought food to the apartment. When Victim 2 entered the apartment, Victim 1 was still in the bathtub where she had been placed on Monday night. Victim 2 was "rushed" by several men, all of whom were holding weapons of some type. Victim 2 yelled out Victim 1's name and that she had "set" him up. Victim 1 could hear the men beating Victim 2 and demanding money. Victim 2 was subsequently moved to the bedroom and hit in the head with a gun. By this time, he had suffered a serious knife wound to his arm; one of the robbers fashioned a tourniquet and stated in substance that he did not want Victim 2 to die until they had the money. Victim 2 finally gave the men the combination to a safe that he kept in the Neill Avenue

---

[5] While the term "rape" was used, it is not necessary that the Court determine if the incident would meet the legal definition of "rape"; Victim 1 testified that three men ejaculated and there is no doubt that the incident involved conduct of a sexual nature involving Victim 1 without her consent.

apartment. Some of the robbers went to that location, emptied the safe, and returned to the Magenta Avenue apartment. They told Victim 2 that the money they had obtained from the safe ($40,000) was not enough. They demanded that he call someone and have them bring $250,000 over or they would kill him. When Victim 2 placed the first call, one man had a gun pressed to his temple, another had a knife behind his ear, and a third had a knife at his throat. When no one answered, the robbers asked if there was anyone else and Victim 2 stated that they could call his mother. The robbers placed a call to his mother but she did not answer.

The robbers sprayed the apartment with a cleansing solution and left. As they were leaving, one dropped a knife near Victim 1 (who was still bound in the bathtub) and told her she could free herself.

After the robbers left the apartment, Victim 1 freed herself and Victim 2.[6] Victim 2 stated that Victim 1 smelled of urine and looked terrible; she subsequently took a shower. Victim 1 called her sister who encouraged her to call the police. Victim 1 had not initially wanted to involve the police because of her concern that, because the robbery was drug-related, it would result in other problems. She told her sister and her daughter that she had been raped but did not tell the police or the hospital staff because she was embarrassed. She never told Victim 2 directly that she had been raped though she told him they had "stole[n] her dignity," which

---

[6] Defense counsel has focused on a statement made by Victim 1 that she initially considered leaving Victim 2 bound, as incongruous with her position as a victim. There are a multitude of reasons why a victim of a rape and three-day kidnapping event would initially not be thinking clearly and/or additionally blame the individual who she may have considered to have been the reason the event occurred.

he understood to mean that she had been raped.  After Victim 1 and 2 spoke to the

police, they went to the hospital in an ambulance where Victim 2 had stitches in his

arm from the knife wound and staples in his scalp for the cut in his head where he

had been hit by the butt of the gun.  Victim 1 did not report to anyone at the

hospital that she had been raped; she was treated for the pain in her wrists and the

burns to her skin from the duct tape.

## II.     APPLICABLE LEGAL PRINCIPLES

Courts faced with disputed factual issues relevant to a sentencing proceeding

have broad discretion in determining how to resolve such issues.  United States v.

Bahel, 662 F.3d 610, 646 (2d Cir. 2011).  Courts can, but are not required to, hold

evidentiary hearings at which witnesses testify and are subjected to cross-

examination.  See United States v. Fatico, 597 F.2d 707, 711-14 (2d Cir. 1978).

Because such factual disputes are in connection with a sentencing proceeding,

courts are not bound by rules governing hearsay, so long as the basis for the court's

determination has indicia of reliability and is not otherwise contrary to a

defendant's due process rights.  Id. at 713-14.

A court must make its determinations of disputed issues using the

"preponderance of the evidence" standard.  United States v. Ahders, 622 F.3d 115,

119 (2d Cir. 2010); United States v. Garcia, 413 F.3d 201, 220 n.15 (2d Cir. 2005).

As used in the Guidelines, "sexual exploitation" during a kidnapping

includes, inter alia, knowingly causing a person to engage in a sexual act by

threatening or placing that person in fear that they or another person will be

7

subjected to death, serious bodily injury or kidnapping. See 18 U.S.C. § 2241;

U.S.S.G. § 2A4.1(b)(5), App. Note 3 ("Sexually exploited" includes offenses set forth

in, inter alia, 18 U.S.C. § 2241).

The Guidelines do not define the term "ransom." At the commencement of

the Fatico hearing the Court noted as much and stated that it wanted to be certain

that there was no dispute as to the legal definition of what constituted a ransom.

(1/15/14 Hearing Tr. at 7-8.) The Court referred to two cases that provide a

definition of ransom in a different context, that definition being "consideration paid

or demanded for the redemption of a captured person." United States v. Escobar-

Posado, 112 F.3d 82, 83 (2d Cir. 1997); see also United States v. Pantoja-Rosales,

494 F. App'x 453, 456 (5th Cir. 2012) (similar). Neither defense counsel nor the

Government expressed disagreement with this definition.

III.   ANALYSIS

A.   The Sexual Assault

There is no doubt in this Court's mind that Victim 1 was sexually exploited

during the kidnapping. The Court finds this by far more than a preponderance of

the evidence, though that is all that is required. Counsel for defendant Cole (not

counsel for Jean Philippe) argued that while he concedes that Victim 1 was in fact

kidnapped against her will, bound, held for almost three days, and urinated on, that

somehow she was vaguely involved in the robbery. Most importantly, he argues

that Victim 1 has invented the rape as a way of trying to distance herself from the

robbers and not have her (now) ex-boyfriend stop assisting her financially.

8

This theory is confused and makes no sense. Of course it makes no sense to be somehow involved in the robbery and to also be a conceded victim of, at the very least, a violent kidnapping associated with the robbery. It makes no sense to be involved in a robbery and also to be held bound for a day (which defense counsel conceded she was) before she even used the correct cellphone number for Victim 2, and then to remain slow to lure Victim 2 to the apartment. Indeed, it is only after the rape that Victim 1 calls Victim 2 again and finally gets him to come to the Magenta Avenue apartment.

In addition, this theory is inconsistent with the evidence. It is undisputed that Victim 1 did not immediately report the rape—and has never, in fact, told Victim 2 directly that she was raped. The most she has said, in a text, is that "they" had "stole[n] her dignity." Not divulging the very information to the very person Victim 1 is, according to this theory, seeking to somehow mislead, renders the entire theory that the rape allegation was fabricated an incredible concoction.

It is true that Victim 1 did not report the rape to the police or at the hospital immediately following the incident. It is true that there is no physical evidence of the rape as a result. It is also true that this is not the first time and will not be the last that a woman has not reported a rape for any number of reasons.

Defense counsel also argue that support for Victim 1's involvement is based on the fact that a prior robbery, to which she and Victim 2 had also been subject, had involved her daughter and a woman named Lisa Hylton. Lisa Hylton is the daughter of one of the women that Victim 1 had been playing bingo with the night

the kidnapping commenced. Victim 1 testified credibly that she has not spoken to Lisa Hylton since the prior robbery. These facts do not demonstrate involvement. They demonstrate that Lisa Hylton and Victim 1's own daughter are troubled and that Hylton may have learned of Victim 1 and 2's financial circumstances from her mother. That inference does not lead to the inference that Victim 1 gave the robbers permission to kidnap her and treat her with brutality (which the defendants concede occurred), nor does it prove that she was not raped.

The other points defense counsel attempted to make on cross-examination the Court finds equally unavailing.

B.     The Ransom

That after he was beaten, cut, hit in the head and bound, Victim 2 gave the robbers the telephone numbers for "Abraham" and his mother, and that calls were placed to try to obtain a large sum of additional money, is not disputed. Rather, defendants appear to be making a legal argument that the events relating to the demand for money do not constitute a "ransom." This Court disagrees.

As set forth above, a ransom is, in connection with a kidnapping, a demand for money or other consideration in connection with the release of a captured person. Victim 2 was plainly captured. A demand for money was clearly made. Defendants' argument appears to be that such demand was not in consideration for Victim 2's release. There is, however, no requirement that a ransom demand occur as it might in the movies or an episode of Law & Order, in which the kidnappers

10

explicitly themselves demand money from a third party to obtain the release of a victim. That may be one way for a ransom demand to occur, but there are others.

Based on the context of the kidnapping here before the Court, there is no doubt that the robbers' demand that Victim 2 obtain more money can only reasonably be understood as a demand for money as a condition for Victim 2's release. That the robbers did not themselves speak with a third party but instead caused Victim 2 to attempt to do so is of no moment, nor is the fact that the demand was unsuccessful. What is undisputed is enough to fulfill the legal requirements: Victim 2 was kidnapped and seriously brutalized; when the safe at his apartment did not have sufficient money to satisfy the robbers, they demanded more. In this context, this demand was undeniably made in connection with a threat to Victim 2's survival and/or release. That is a demand for ransom.

IV.   CONCLUSION

For the reasons set forth above, the Court finds by a preponderance of the evidence that Victim 1 was sexually assaulted and the kidnapping to which the defendants pled guilty involved a ransom demand.

SO ORDERED.

Dated:      New York, New York
            January 27, 2014

                              _____
                              KATHERINE B. FORREST
                              United States District Judge

11